UNITED STATES *v.* DECAL PRODUCTS CO. ET AL.

**No. 5017.**—Invoices dated Breslau, Germany, September 27, 1937, etc.
    Entered at New York October 18, 1937, etc.
    Entry No. 91686, etc.

(Decided October 7, 1940)

*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellant.

*Strauss & Hedges* (*Barnes, Richardson & Colburn*, associate counsel, *Albert McC. Barnes* and *J. Bradley Colburn* of counsel) for the appellees.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This cause came on for hearing on an appeal from the decision of a single judge (Reap. Dec. 4748) who found the dutiable values of the imported merchandise to be the export values thereof (as defined in section 402 (d) of the Tariff Act of 1930) as entered, at the unit prices on certain so-called test cases. The United States appraiser had found the merchandise to be dutiable on the basis of the foreign-market value under paragraph (c) of the same section of the act. At the hearing before the single judge nine cases were consolidated of which number three were so-called duress entries, that is entries on which the importer had made advances in the unit values to meet advances made by the appraiser in similar cases pending on reappraisement.

The merchandise in question is described as decalcomanias. Webster's New International Dictionary, second edition, defines decalcomania as follows:

Art or process of transferring pictures and designs, as from specially prepared paper, to china, glass, marble, etc., and permanently fixing them thereto; a picture or design prepared to be so transferred; also, a paper on which designs are printed for transfer printing.

From the description of these articles they fall within the last-named group of the above definition. The use of the merchandise is described by affidavits in evidence submitted by three qualified experts connected with some of the largest manufacturing concerns in Germany who were engaged in producing this character of merchandise. From these affidavits it is apparent that two types of decalcomanias are manufactured in Germany, the country of exportation, which are intended for use in transferring colored designs to porcelain, china, pottery and similar wares. The method of manufacture and the mode of application of the type manufactured for domestic consumption in Germany and for export to countries other than the United States has been quite uniformly described in substantially the following language:

(a) These ceramic colored prints are printed on so-called Simplex or Meta paper; this is an especially simple paper with an adhesive coating and is exclusively manufactured in Germany. This Meta or Simplex paper essentially differs from the Duplex paper which is used for the manufacture of colored prints for export to the United States of America, as stated below.

(b) The colors, which are used for the printing of the patterns in connection with ceramic colored prints for domestic consumption in Germany, are manufactured exclusively in Germany.

(c) All ceramic colored prints which are produced by my firm or by any other factory of the same kind in Germany must be manufactured, in accordance with the instructions of the German Government, from material which is only produced in Germany. Beginning with the paper and the colors which are used for the manufacture of such colored prints for consumption in Germany, everything is manufactured completely in Germany.

(d) The colors which are used for the patterns of the ceramic colored prints for manufacture for domestic consumption in Germany have not been mixed by us with flux, so that they withstand a baking temperature of 750° to 850° without burning or without the appearance of the color being detrimentally affected.

(e) It is in accordance with my personal knowledge and experience that the ceramic colored prints, which are manufactured for domestic consumption in Germany, are used exclusively on German or other European markets, and that as far as I know, they are never made or sold for export to the United States of America. (Coll. Ex. A-1).

This witness also described the method of manufacturing the ceramic colored prints (decalcomanias) produced in Germany for export to the United States as follows:

(9) I furthermore declare that the ceramic colored prints which were manufactured by my firm and shipped to the United States of America during the last four years, are completely represented by the patterns attached hereto and marked from A-1 to A-15. All other patterns manufactured for the United States of America deviate only in the drawing (pattern or design) and in the number of colors used for the manufacture, from these fifteen samples.

(10) I furthermore declare (sic): The said ceramic colored prints which were made by my firm for export to the United States of America and which are hereto attached and marked from A-1 to A-15 have the following characteristic features, which deviate from all other ceramic colored prints sold by my firm on the German domestic market.

(a) They are printed on so-called Duplex paper, which is a special paper consisting of two sheets; the upper sheet carries a thin adhesive layer which serves at the same time as support or carrier of the color and on which the design is printed; the lower paper is the basic paper or matrix. This Duplex paper is especially manufactured in England and imported from England to Germany, exclusively for the printing of ceramic colored prints which are manufactured for export to the United States of America.

(b) Many of the colors which are used for the printing of ceramic colored prints are imported from England for manufacture for export to the United States of America—shown by the attached samples marked from A-1 to A-15—especially for use in connection with the printing of ceramic colored prints which are exported to the United States of America.

(c) It is necessary for my firm to obtain from the German Government the right to import both from England, namely, this Duplex paper and certain colors, which are used in the manufacture of colored prints for sale to the United States of America. Such a permit is based on an agreement, in accordance with which the imported color and the imported paper are used only in connection with ceramic colored prints which are exported from Germany.

(d) The colors which are used in connection with the printing of the ceramic colored prints for export to the United States of America—represented by the samples hereto attached and marked A-1 to A-15—are bound or combined with

up to 30% flux—in the average up to 10%—so that they bake satisfactorily at a firing (baking) temperature of up to 613° C.

These decalcomanias have been called Simplex and Duplex because of the fact that the first type is printed on so-called Meta or Simplex paper (single sheet) with an adhesive coating, whilst the Duplex type is printed on English duplex paper, which is described as consisting of two sheets, the upper sheet being thin and transparent and carrying a thin adhesive layer which serves at the same time as a support or carrier of the color and on which the design is printed, and a lower sheet, which is known as the backing and consists of heavy paper or matrix.

At the outset of the trial the parties stipulated that two types of decalcomanias were manufactured and sold in Germany, one for home consumption and for export to countries other than the United States, the other for export to the United States. The stipulation is summarized in the decision below and has been there elaborated upon slightly, but only to make clear the plain purpose for which it was made, in this: at the opening of the case nothing was said about the duress entries that were consolidated herein. In order to clearly limit the second part of the stipulation to the importer's claimed unit values to such as are on the test cases and not the values as advanced, certain limiting language was added. It seems that this fact was clearly within the contemplation of the parties in making the stipulation because it appears in the record as well as twice in the brief of the Government that the only question involved in the controversy was the similarity between the imported articles and the articles sold in Germany for home consumption and for export to countries other than the United States.

The testimony of the witnesses was very carefully, painstakingly and impartially summarized in the decision of the trial judge and it can serve no good purpose to resummate such testimony.

The trial judge found that the imported product was not similar or identical with the type of merchandise produced for home consumption and for export to countries other than the United States, and therefore, under the terms of the stipulation, he found the proper values in accordance with the provisions of said stipulation to be the export values, or, in the case of the so-called duress entries, the importer's claimed unit values, all plus cases and packing as invoiced. As was pointed out in this decision, the Government offered no testimony but rested its case on a motion to dismiss for failure of proof. It contends that the importer has not made out a *prima facie* case. As we view the Government's argument, it rests primarily upon the proposition that there was no substantial evidence to show that merchandise similar to the instant importations had not been sold in Germany at or about the time of these exportations for export to countries other than

the United States, and that since sales to other countries than the United States might, under the decisions, determine what was the market value it was incumbent upon the importer to show that there were no such sales of this or similar merchandise for export to such other countries. On this point the importer contends that the Government attempts to abandon its position as made by its stipulation; that the stipulation fairly construed contemplated that the instant type of merchandise was made and sold only for the United States and that the kind made in Germany for home consumption and for export to countries other than the United States was the kind that formed the basis of the Government's appraisement.

It must be observed, however, that the importer could not have escaped noticing the insistence of the Government at the time of making the stipulation that there should be included therein the phrase "and for export to countries other than the United States," and therefore, that it possibly was relying on the fact, if it was a fact, that similar merchandise had been or was being sold in Germany for export to other countries than the United States. On that point, however, we are of the opinion that there is substantial testimony to clearly refute that contention. It is given in the testimony of two witnesses of long experience in importing this type of merchandise, one of whom had, for over 20 years, gone to Germany during that time to make his purchases, and the other for 15 years, up to the time these goods were exported, had been visiting the manufacturers in Germany. These witnesses testified that the type of decalcomanias for export to the United States was made exclusively for export to this country and was not sold in Germany for export. We think a fair inference to that effect is found in each of the affidavits A–1, A–2, and A–3, where with reference to the type made for export to the United States, on the English paper, words of similar import to this language is found:

This Duplex paper is especially manufactured in England and imported from England to Germany, *exclusively for the printing of ceramic colored prints which are manufactured for export to the United States of America.* [Underscoring ours.]

A somewhat similar statement is made with reference to the colors used in the manufacture of the type of decalcomanias exported to the United States.

We therefore conclude that neither like nor similar merchandise was sold in Germany for export to countries other than the United States.

Many samples were produced upon which experiments had been made the purpose of which was to show the dissimilarity in the results obtained from the use of the two types of decalcomanias. All of the testimony, as was found by the court below, is to the effect that the German type paper, the Simplex, made as it is largely without

flux in the color, is the only type that can be used in the firing kilns or furnaces in use in Germany where they had their furnaces at much higher temperatures than is the practice in the United States, the temperature in the German furnaces ranging around 750° to 850° centigrade, while in the United States the Duplex decalcomanias are used in kilns or furnaces where the temperature never reaches that high degree.

We find from the record that the testimony supports the decision of the lower court to the effect that the instant merchandise is applied to the surface to be decorated in a different manner, that is, it is handled in a different way. This fact, coupled with the absolute proof that the materials used in manufacturing the two different papers are different, supports the conclusion reached by the trial court that the imported merchandise is not similar, within the construction given to that term by the courts, to that made for German use or for export from Germany to countries other than the United States, even though the ultimate purpose of both types is to transfer decorative designs to china, pottery, and similar wares. The courts have outlined a number of tests by which similarity is determined but no one of the cases, in our judgment, has gone off on the fact that a single element elicited by tests could serve to establish similarity; no more than the fact that because Roquefort cheese is used for eating purposes, "portion" cheese and "standard" cheese are similar. See *United States* v. *Kraft Phenix Cheese Corp. et al.*, 26 C. C. P. A. 224, C. A. D. 21.

For the foregoing reasons, the decison of the trial court is affirmed. Judgment will be rendered accordingly. It is so ordered.