(A.R.D. 212)

UNITED STATES *v.* OSCAR E. EGGEN (AMERICAN EXPRESS CO.) ET AL.

Entry No. 37863, etc.

Third Division, Appellate Term

(Decided August 29, 1966)

*John W. Douglas*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the appellant.

*Lawrence & Tuttle* (*Edward N. Glad* and *Robert Glenn White* of counsel) for the appellees.

Before DONLON, RICHARDSON, and LANDIS, Judges; DONLON, J., concurring

LANDIS, Judge: This case comes before us on an application for review of a decision and judgment rendered by Judge Ford in reappraisement (54 Cust. Ct. 508, Reap. Dec. 10901), holding that cost of production was the proper basis of dutiable value of certain imported ball bearings, as claimed by the plaintiffs below.

Originally, this case was heard and decided by the late Judge Jed Johnson (*Oscar E. Eggen* (*American Express Co.*) *et al.* v. *United States*, 46 Cust. Ct. 694, Reap. Dec. 10013). Ten appeals for reappraisement were consolidated for trial.

The merchandise involved herein consists of certain metric-size and inch-size ball bearings and parts, imported from West Germany, subject to appraisement under section 402a of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (70 Stat. 943), by virtue of the fact that ball bearings and parts appear on the final list of articles published in accordance with the statute in T.D. 54521. Accordingly, the items covered by these appeals were appraised on the basis of the foreign value of similar merchandise, as appears below, together with the claimed cost of production calculations:

| Item | Type shield | Appraised value (per bearing) | Cost of production (per bearing) |
|---|---|---|---|
| R2''ZZ, ABEC 1 | Stainless steel | DM3.20 each | DM1.88 each |
| R2''ZZ, ABEC 3 | Plain metal | DM3.20 each | DM1.90 each |
| R2''ZZ, ABEC 3 | Stainless steel | DM3.20 each | DM1.94 each |
| R3''ZZ, ABEC 1 | Stainless steel | DM2.60 each | DM1.46 each |
| R3''ZZ, ABEC 3 | Plain metal | DM2.60 each | DM1.50 each |
| R3''ZZ, ABEC 3 | Stainless steel | DM2.60 each | DM1.56 each |
| R3''AZZ, ABEC 1 | Plain metal | DM2.60 each | DM1.46 each |
| R3''AZZ, ABEC 3 | Plain metal | DM2.60 each | DM1.57 each |
| R4''ZZ, ABEC 1 | Stainless steel | DM2.25 each | DM1.28 each |
| EL8ZZ, ABEC 1 | Plain metal | DM2.25 each or DM2.30 each | DM1.24 each |
| EL8ZZ, ABEC 1 | Stainless steel | DM2.30 each | DM1.30 each |

all the above less 15%, less 5%, packed, or plus packing where indicated as included in invoice price.

It was contended by the appellees (plantiffs below), in the original trial before Judge Johnson (and later in the second trial before Judge Ford), that the merchandise was properly subject to appraisement on the basis of cost of production, as set forth in section 402a(f) of the Tariff Act of 1930, as amended, 19 U.S.C.A., section 1402(f). The court, in its original decision (Reap. Dec. 10013), found as a matter of law, based upon the record as originally made, that no foreign, export, or United States value for *such* merchandise existed. The court also found that the evidence therein was insufficient to negate the existence of export or United States value of *similar* merchandise and the importers had, therefore, failed to sustain their burden of proof. The court, however, did not decide the question of similarity of the metric-size and inch-size bearings for the purpose of foreign value.

On motion thereafter, the decision and judgment were set aside by Judge Johnson and a rehearing for all purposes was granted (47 Cust. Ct. 412, Reap. Dec. 10047).

At the subsequent hearing before Judge Ford, additional testimony was taken and decision and judgment were rendered in favor of the appellees (plaintiffs below). This decision and judgment are now before us on an application for review. On the issue of similarity, the trial court held that the imported inch-size ball bearings were not similar to the metric-size ball bearings for which a foreign value had been established in West Germany. The court also found that there existed a foreign value for the metric-size bearings, but that concerning the inch-size bearings, there was no foreign, export, or United States value for such or similiar merchandise, and that cost of production was the proper basis of appraisement of said inch-size bearings. The court found satisfactory proof of the elements of cost of production to sustain the amounts as claimed by the importers, the appellees herein.

Appellant (defendant below) thereafter moved for a rehearing, which was denied (54 Cust. Ct. 624, Reap. Dec. 10953).

The appellant's twelve assignments of error narrow themselves to inquiry concerning:

1. The similarity of the imported inch-size bearings to the metric-size bearings which were freely sold and offered for sale in the home market in West Germany;

2. the nonexistence of foreign, export, or United States value, proof of which was incumbent upon the appellees;

3. the adequacy of proof to establish the essential elements of cost of production of the imported inch-size bearings under section 402a(f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956; and

4. the propriety of denying, by order of April 13, 1965 (Reap. Dec. 10953), appellant's motion for a rehearing filed March 29, 1965.

The fourth of the above assignments of error may be disposed of first, briefly. It is well established that the matter of granting a rehearing in a case lies within the sound legal discretion of the Customs Court, and where such discretion is not abused, no error can be assigned upon it. *The Taggesell Co. (Inc.)* v. *United States*, 17 CCPA 15, T.D. 43318. The appellant, in the case at bar, indicates no such abuse and, therefore, the trial court's denial of a rehearing was not error and will not be disturbed. See also *Thornley & Pitt et al.* v. *United States*, 19 CCPA 221, T.D. 45325, affirming T.D. 44500. Further, there can be no appeal from an order granting or denying an application for rehearing. *Waller-Muller Co.* v. *United States*, 21 CCPA 318, T.D. 46833.

We refer to the record as originally made. It consists of the testimony of the importer, Oscar E. Eggen, an affidavit of Michael Groh, export manager of the German manufacturing firm, samples of the merchandise, received in evidence as plaintiffs' exhibits 1 through 5, inclusive, and a report by Customs Representative Heinz L. Herz, received in evidence as defendant's exhibit A.

The court, in its original decision, set forth concisely the testimony of Mr. Eggen as follows (46 Cust. Ct. 695) :

At the trial, Oscar E. Eggen, sales engineer and importer of bearings from Germany, testified as follows: The designations on the invoices, R2″, R3″, R4″, and EL8, indicate the size of the bearing; the letters ZZ mean that shields are included; and the letter A in the designation R3″ A indicates that the bearing is a little wider than the R3″ size. The bearings with the designation R are manufactured in inch dimensions, but the bearings with the designation EL are in metric dimensions. The size bore of these items is as follows:

| | |
|---|---|
| R2″ZZ | $\frac{1}{8}$ of an inch |
| R3″ZZ | $\frac{3}{16}$ of an inch |
| R4″ZZ | $\frac{1}{4}$ of an inch |
| EL8 | 8 millimeters |

The record on rehearing before Judge Ford (54 Cust. Ct. 508, Reap. Dec. 10901) consists of the oral testimony of Mr. Michael Groh, the same party whose affidavit was received in evidence at the original hearing, and a Mr. William F. Meerwarth. In addition thereto, an additional affidavit of Michael Groh was received in evidence as well as affidavits of various other witnesses in Germany.

Based upon the conclusions of law in the original opinion (Reap. Dec. 10013), there appeared no question that no foreign, export, or United States value exists for such merchandise. However, since the appraisement was based upon similar merchandise, and the statutory definitions of value—foreign, export, and United States values—refer to *such or similar* merchandise, it was incumbent upon appellees

(plaintiffs below) to negate the existence of such values for similar merchandise.

With respect to foreign value, the court found that the record satisfactorily established, by virtue of the testimony of Messrs. Eggen, Groh, and Meerwarth, metric-size ball bearings are not similar to inch-size ball bearings, stating that, while there is no hard-and-fast rule defining similarity for appraisement purposes, the following questions should be included in considering similarity of different items:

1. Are the articles made of approximately the same material?

2. Are they capable of or adapted to the same use and may they be substituted for one another?

3. Are they of the same approximate commercial value?

The court found the first question answerable in the affirmative in that metric-size and inch-size bearings were made of approximately the same material; the second question was found answerable in the negative, since the record established that the two kinds of bearings were not interchangeable. The court observed that, while interchangeability and substitution were not indispensable to a finding of similarity (citing *United States* v. *Thomas & Co. (Dehler-Signoret Corp.)* 21 CCPA 254, T.D. 46788), nevertheless, this coupled with the answer to the third question, i.e., on the difference in costs, the fact that the cost of production of inch-size bearings produced in Germany was approximately 20 percent higher than the metric-size, satisfied the court of their dissimilarity for appraisement purposes. The court was of the opinion, therefore, that no foreign value existed for such or similar merchandise, and so held.

We note that appellant, in its brief, assails the findings of the trial court as being based on the three questions which it *included* in considering similarity, namely, whether the articles were made of approximately the same material, whether they were capable of or adapted to the same use and could be substituted one for another, and whether they were of the same approximate commercial value. In satisfying itself on the adequacy of proof on these points, the trial court was of course not confined or limited to these three inquiries, nor was it precluded from ascribing evidentiary weight to other factors in evidence in arriving at its findings of fact and conclusions of law. These further factors support the findings of the trial court. For instance, we observe a significant factor which, in our opinion, accentuates the dissimilarity of the two kinds of bearings. The record is quite clear that inch-size bearings were not used, and could not be used, in Germany. (Use by I.B.M., an American manufacturer, in its branch in West Germany, represents an isolated situation without significance herein.)

Metric-size bearings only were used in Germany. The testimony of record is equally clear that, in their actual use, substitution of one for the other was quite impractical and quite impossible, and that metric-size bearings for use in Germany were of necessity made to German standards and inch-size bearings were made as a different and special production to American standards. Although made of the same materials and for a like ultimate use, these factors alone do not establish similarity.

In *United States* v. *Kraft Phenix Cheese Corp. et al.*, 26 CCPA 224, C.A.D. 21, two kinds of Roquefort cheese were manufactured in France, the "Standard" Roquefort and "Portion" Roquefort. The "Standard" Roquefort was sold in France for home consumption, at a higher price because of a different method of manufacture resulting in a higher cost of production, and which was difficult to cut, without crumbling, into wedge-shaped pieces, as marketed for use in this country. A new treatment of the sheep's milk and different curing resulted in a cheese of firmer texture and less mold, capable of being cut with little or no crumbling. The sole issue there was whether the imported "Portion" Roquefort was similar to the "Standard" Roquefort cheese sold in the home market in France and for which a foreign value was established. The "Portion" Roquefort was manufactured for the American market especially. The court, holding the two Roquefort cheeses dissimilar even though made of the same material, stated (page 230):

In a broad sense, of course, the ultimate use of both types may be said to be the same. They are both eaten as Roquefort cheese. * * *

The case of *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714, is often cited as the leading case on the interpretation of "such" and "similar" merchandise in reappraisements. The word "similar" is defined therein, as taken from Webster's New International Dictionary (1925):

Similar. a.1. Nearly corresponding; resembling in many respects; somewhat like; bearing a general likeness.

The imported merchandise involved in the *Massin & Bros.* case was certain black silk hatters' plush. The quality of the plush sold in the home market in Germany was far superior both in finish and construction to that imported. Foreign value for the former was conceded. Similarity of the cheaper quality imported hatters' plush to that sold in the home market was in issue.

The court there expressed (page 25):

* * * we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b). * * *

The court, however, went on to state (pages 25–26) :

\* \* \* The differences in construction of quality 5400 and 2522, as shown by the report of the analyst, might not be so great, in our opinion, as to prevent these fabrics being considered as similar, if other elements of the proof to establish similarity were present. There is, however, one element which prevents them from being so considered, namely, their adaptability to use. It appears, from the uncontradicted testimony of Harry S. Radcliffe, that the two compared materials can not be used for the same purposes; that the imported material is used for making blocked and men's silk hats, while quality 5400 is adapted to use for general millinery purposes, in draping ladies' trimmed, loose hats, for which it is used, and that the goods are not interchangeable.

Thus, the element of adaptability engages our consideration with respect to the inch-size bearings manufactured for the United States only. We treat this *infra*.

Appellant cites *United States* v. *Thomas & Co.* (*Dehler-Signoret Corp.*), *supra*, on the question of interchangeability. That case involved certain paper tubes and bobbins which process yarn during spinning. The tubes are about 6½ inches long with corrugated rings, some with more corrugation than others, varying slightly in diameter, some more tapered than others.

Despite these features of dissimilarity, and even though they were not mechanically interchangeable at all times, the court held the imported tubes and bobbins similar to tubes and bobbins in the country of exportation, saying at page 259 :

\* \* \* we think the goods are composed of the same material, made in substantially the same way, and it is fair to assume that their cost of production does not materially vary by reason of the taper or corrugations. While the record shows that certain American manufacturers and Czechoslovakian manufacturers could not use on their particular spindles tubes having a taper not designed to fit the spindle of their machines, and that they would not accept, as a compliance with their orders, tubes made with a taper which did not fit, it also is shown that others, there and here, could use tubes with such a taper, and when used, all were used for the same purpose; that each of the compared articles is made from the same material, by the same processes, and when finished has no material differences which would render them dissimilar for valuation purposes. \* \* \*

However, we distinguish the case at bar, for we discern in the *Thomas & Co.* case more than a question of interchangeability. The fact that the tubes and bobbins could be used at times in the place and stead of similar tubes and bobbins indicated an adaptability for such use. Substitution of one for the other was possible. Such adaptation and substitution are not feasible as between the metric-size and the inch-size ball bearings at bar. See also *Plywood & Door*

*Manufacturers Corporation* v. *United States*, 44 Cust. Ct. 541, Reap. Dec. 9581, wherein, *inter alia*, we noted on page 545:

A comparison of inch and millimeter equivalents, offered and received in evidence as plaintiff's collective exhibit 5, demonstrates that none of the millimeter equivalents is exactly the same as the common fractional inch thicknesses used in manufacturing plywood. The only thicknesses which are approximately the same are the 19-millimeter thickness and the three-fourths of an inch (19.05 millimeters), but I am of the opinion that this single instance of approximate thickness points up the difference, rather than the similarity, of plywood manufactured according to the two different standards of measurement.

It is clear, in our opinion, that the record at bar indicates a complete lack of possible substitution and adaptability for use of the inch-size bearings in the stead of the metric-size bearings used in Germany.

We note that appellant in its brief, referring to the *Thomas & Co.* case, *supra*, recites that the merchandise involved was inch-size and metric-size paper tubes and bobbins. Neither in the original opinion of the trial court (Reap. Circ. 2530, decided in 1932), nor in the opinion of the Court of Customs and Patent Appeals, cited, *supra*, were the terms "inch-size" and "metric-size" used.

While we are of course aware that the metric system of measurement is utilized on the continent of Europe, including Czechoslovakia, we are unable, from an examination of the several opinions in the *Thomas & Co.* case, *supra*, to ascertain that the court considered the difference in measurement between the metric and linear systems to be significant in its opinion. We believe it, therefore, of little use in support of the Government's contentions in the case at bar.

In *United States* v. *Decal Products Co. et al.*, 5 Cust. Ct. 537, Reap. Dec. 5017, affirming 4 Cust. Ct. 672, Reap. Dec. 4748, certain merchandise described as decalcomanias was imported from Germany. Briefly, a decalcomania is a specially prepared paper on which designs are printed for transfer to other articles, such as china, glass, marble, etc. Two types of decalcomanias were manufactured and sold in Germany, one (the Simplex) for home consumption and for export to countries other than the United States, for which foreign value was established; the other (the Duplex) for export to the United States.

The only question involved was the similarity between the two.

Two qualified witnesses testified that the type of decalcomanias for export to the United States was made exclusively for export to the United States and was not sold in Germany for export. The testimony in effect showed the Simplex decalcomanias, sold in Germany's home market, could be used in kilns at much higher temperatures than was the practice in the United States with the Duplex decalcomanias. Also, the materials of manufacture of each kind of decalcomania

differed, and application of the design was handled in a different manner.

The court held that the decalcomanias were dissimilar (page 542) :

* * * even though the ultimate purpose of both types is to transfer decorative designs to china, pottery, and similar wares. The courts have outlined a number of tests by which similarity is determined but no one of the cases, in our judgment, has gone off on the fact that a single element elicited by tests could serve to establish similarity; no more than the fact that because Roquefort cheese is used for eating purposes, "portion" cheese and "standard" cheese are similar. See *United States* v. *Kraft Phenix Cheese Corp. et al.*, 26 C.C.P.A. 224, C.A.D. 21.

In *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T.D. 42837, imported cotton velveteen was appraised on the basis of foreign value in that similar merchandise was freely offered for sale to all purchasers in the principal markets in the country of exportation. Similarity was the issue, involving, *inter alia*, the factor of acceptance of a substitute article as good delivery, this constituting an argument for similarity.

Witnesses testified, in effect, that the velveteen sold in the home market was of better quality than that imported, and that the imported product was not commercially interchangeable and would not be acceptable as good delivery on an order for the home market product, because it was lighter, had less pile, poorer finish, was not dyed as well, and was made of cheaper raw materials.

The court of customs appeals followed the *Massin* case, *supra*, and sustained the lower court, upholding the finding of dissimilarity, stating in its opinion (page 225) :

* * * The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402(b).

Counsel for the appellees, in his oral argument to the court on the application for review herein, cited *H. P. Lambert Co. (Inc.)* v. *United States*, Reap. Circ. 2703, decided in 1932. The case involved bundles of steel bars imported from Germany, entered at export value, and appraised at foreign value.

Foreign value had been established for steel bars in the home market in Germany where they were sold by millimeter measurement.

The imported merchandise was measurable and sold by the inch or foot. On the question of foreign value for the imported merchandise, on the ground that it was similar to the steel bars in the home market, the court decided:

\* \* \* (1) That the merchandise exported to the United States is not similar in size to that sold in the home market; and (2) that it is not similar in size by reason of the fact that it is larger and possibly heavier and thereby sold by the inch or foot, rather than by millimeter measurements as used in Germany.

Thus, the *Lambert* case indicates dissimilarity on a basis of size and weight and inch or millimeter manner of measurement of steel bars, a type of merchandise which, conceivably when in larger sizes, could be machine-rolled down to any desired smaller size. This, understandably, cannot be done with the ball bearings herein. Larger bearings cannot be made smaller, nor the smaller bearings made larger. They are by the nature of their function a precision-fitted article. The record clearly indicates the imported bearings could not be substituted and used in Germany, and any adaptability of the imported inch-size bearings for use instead of the metric-size bearings is demonstrated by the nature of the product itself.

The case of *D. C. Andrews & Co., Inc., et al.* v. *United States,* 47 Cust. Ct. 473, Reap. Dec. 10086, affirmed 50 Cust. Ct. 521, A.R.D. 151, cited by appellant, in our opinion, is not in point. The imported metal lathes involved therein represent a complete apparatus, rather than an article such as the bearings at bar.

An earlier case was also cited by appellees' counsel—*Officine di Villar Perosa,* Reap. Circ. 35575, decided in 1925 by the Board of General Appraisers (now the United States Customs Court) on an application for review involving the issue of similarity of certain ball bearings imported from Italy. The ball bearings sold for home consumption in Italy were the notched type, the mechanical construction of which permitted use of a greater number of balls of equal size than the un-notched type. The record indicated that the notched bearings were more valuable and of superior material and workmanship. Accordingly, the board found the imported ball bearings dissimilar to those sold in the home market in Italy. That case merely demonstrates further that all ball bearings are not similar.

Based upon the foregoing, it is established by the record that the inch-size bearings and metric-size bearings herein are dissimilar for appraisement purposes, and this court is of the opinion that, concerning the inch-size bearings, no foreign value exists for such or similar merchandise. Following this determination, proof of the statutory value next becomes essential.

On the question of export value for such or similar merchandise, the record establishes and the trial court found:

* * * that inch-size bearings manufactured in Germany for export to the United States are restricted to particular parties in the United States. It appears that the three firms listed below were the only manufacturers known to produce inch-size bearings.

1. Georg Muller Kugellager-Fabrik K.G., hereinafter referred to as GMK.
2. Kugelfischer Georg Schafer & Co., hereinafter referred to as KGS.
3. Gebruder Reinfurt.

The testimony of Mr. Groh clearly establishes the restriction of sales by GMK of inch-size bearings to the United States.

The affidavit of Kurt Göttel stands unrebutted as to the fact that KGS does not manufacture inch-size bearings of this R series, ranging from R2 to R8, involved herein. The affidavit of Heribert Leisaner establishes that the firm of Gebruder Reinfurt sold to only one selected purchaser in the United States in the year 1959, involved herein.

Accordingly, the evidence is sufficient to negate the existence of export value for such or similar merchandise.

On the question of United States value, the court held that the record shows amply that a United States value did not exist for such merchandise since KGS never manufactured bearings in the R series ranging from R2 to R8, providing no basis of similarity for United States value. Based upon the conclusions of law in the original opinion, Judge Ford in trial court, after hearing further testimony, concurred that no foreign, export, or United States value existed for such merchandise. In this, we concur, and find affirmatively, as did Judge Johnson and Judge Ford, respectively, that there is no United States value for such merchandise. It also appears from the affidavit of Mr. Leisaner that the inch-size bearings made by GMK were not produced by any other German manufacturer. Therefore, similarity between the product of Gebruder Reinfurt and GMK could not be considered for establishing United States value. It was, therefore, satisfactorily established that there was no United States value for such or similar merchandise.

The next basis of appraisement under the statute is cost of production. The trial court found the cost-of-production figures contained in the original affidavit of Mr. Michael Groh stood unrebutted and were in compliance with the statute. Accordingly, the record supports, as the trial court found, that the proper basis of appraisement for inch-size bearings in the R series ranging from R2 to R8 was cost of production.

The cost-of-production figures set forth in finding No. 4, *infra*, are based on the actual profit of the manufacturers. Appellant challenges

the adequacy of proof of the element of profit "equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind," required by section 402a(f) of the Tariff Act of 1930, as amended, *supra.*

It has been held that where such proof of profit was unavailable after diligent effort was made, the *actual* profit of the manufacturer could be added as the profit ordinarily added. *United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407. Cases on the subject of "diligent effort" demonstrate that the court is closely interested in the detailed efforts comprising any alleged diligence. The court in each case must decide whether such effort was adequate or merely perfunctory. It is clear also from *United States* v. *Berben Corporation*, 49 Cust. Ct. 497, A.R.D. 147, that the court appreciates the difficulty under some circumstances of obtaining such proof from competitors. Accordingly, futility of effort will not defeat a litigant if sufficient evidentiary proof of diligence satisfies the court.

In the instant case before the trial court, the witness Groh stated in his sworn statement that he contacted personally some five ball bearings manufacturers, including two other firms that manufactured inch-size bearings, without success. Obviously, no usable information was availed, either on inch-size or metric-size bearings. The trial court, however, was satisfied of due diligence. Accordingly, the actual profit of the manufacturer was admissible in proof of the cost of production of the inch-size bearings in issue. The trial court further stated:

A review of the cost-of-production figures, as contained in plaintiffs' exhibit 6, indicates that for item R4"ZZ,ABEC 1, the profit is 0.06 per centum. Under the statutory provisions, the profit must not be less than 8 per centum of the figures given for material and fabrication plus general expenses. In this instance, the statutory minimum of 8 per centum is 0.09 and said figure is utilized for the cost-of-production figure for R4"ZZ,ABEC 1.

Based on the record before us, we find as matters of fact:

1. The merchandise under consideration consists of ball bearings in the R series ranging from R2 to R8 in inch dimensions.

2. During the period in question, such or similar merchandise was not freely offered for sale to all purchasers in the principal markets of Germany either for home consumption or for exportation to the United States.

3. During the period in question, such or similar merchandise was not freely offered for sale to all purchasers in the principal markets of the United States.

4. At a time preceding the dates of exportation of the particular merchandise involved, which would ordinarily permit the manufacture or production of the particular merchandise under consideration, in the usual course of business, the following were the elements of the cost of production of said merchandise shipped prior to November 5, 1959:

| Item | Materials & fabrication | General expenses | Profit | Packing | Total |
|------|-------------------------|------------------|--------|---------|-------|
| R2″ZZ, ABEC 1, (stainless steel) | 0.91 | 0.31 | 0.61 | 0.05 | DM1.88 |
| R2″ZZ, ABEC 1, (plain metal) | 0.89 | 0.31 | 0.59 | 0.05 | DM1.84 |
| R2″ZZ, ABEC 3, (stainless steel) . | 1.00 | 0.34 | 0.55 | 0.05 | DM1.94 |
| R2″ZZ, ABEC 3, (plain metal) | 0.97 | 0.34 | 0.54 | 0.05 | DM1.90 |
| R3″ZZ, ABEC 1, (stainless steel) | 0.83 | 0.27 | 0.29 | 0.07 | DM1.46 |
| R3″ZZ, ABEC 1, (plain metal) | 0.81 | 0.27 | 0.27 | 0.07 | DM1.42 |
| R3″ZZ, ABEC 3, (stainless steel) | 0.91 | 0.29 | 0.29 | 0.07 | DM1.56 |
| R3″ZZ, ABEC 3, (plain metal) | 0.88 | 0.29 | 0.26 | 0.07 | DM1.50 |
| R3″AZZ, ABEC 1, (stainless steel) | 0.88 | 0.29 | 0.27 | 0.06 | DM1.50 |
| R3″AZZ, ABEC 1, (plain metal) | 0.86 | 0.29 | 0.25 | 0.06 | DM1.46 |
| R3″AZZ, ABEC 3, (stainless steel) | 0.97 | 0.33 | 0.25 | 0.06 | DM1.61 |
| R3″AZZ, ABEC 3, (plain metal) | 0.94 | 0.32 | 0.25 | 0.06 | DM1.57 |
| R4″ZZ, ABEC 1, | 0.86 | 0.27 | 0.09 | 0.06 | DM1.28 |
| R4″ABEC 1, | 0.58 | 0.19 | 0.25 | 0.06 | DM1.08 |

Note: Whenever "ZZ" appears, this may also be shown as "2Z."

We conclude as matters of law:

1. There is no foreign, export, or United States value for such or similar merchandise in the sizes R2 to R8, as further described under findings of fact number 4.

2. Cost of production, as provided for in section 402a(f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for appraisement of ball bearings in sizes R2 to R8 in inch-size dimensions.

3. The cost of production of the merchandise involved and shipped prior to November 5, 1959, as prescribed by the statute, is the total shown for each size and type in findings of fact number 4.

Judgment of the trial court is affirmed accordingly.

CONCURRING OPINION

DONLON, Judge: I concur in the conclusion reached by the majority. In doing so I give great weight, as did Judge Ford, to "the fact that the cost of production of inch-size bearings produced in Germany was approximately 20 per centum higher than metric-size bearings * * *."

I am of opinion that here, as in *United States* v. *Thomas & Co. et al.*, 21 CCPA 254, T.D. 46788, cited by the majority, there was commercial interchangeability even though there was not mechanical interchangeability, and that the considerable variation in costs is the significant difference between the facts of the two cases.

I would not lean on failure of either of the appellate courts to recite, in their opinions, the fact that the Czechoslovakian parts were measured by the metric system and United States parts in inches. It is a fact, commonly known to valuers of merchandise and of which courts may take judicial notice, that in the countries of Europe the metric system was used, by law, during the period of the *Thomas* case. Notwithstanding that difference, all courts in the *Thomas* case— the trial judge, the appellate division, and the court of appeals— found commercial interchangeability, for purposes of customs valuation, as I do here. Nevertheless, I find lack of similarity because of the proven wide variation in costs.